UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in Compliance with D.N.J. LBR 9004-1**
**PORZIO, BROMBERG & NEWMAN, P.C.**
100 Southgate Parkway
P.O. Box 1997
Morristown, New Jersey 07962
(973) 538-4006
(973) 538-5146 Facsimile
Warren J. Martin Jr., Esq. (wjmartin@pbnlaw.com)
Kelly D. Curtin, Esq. (kdcurtin@pbnlaw.com)
Rachel A. Parisi, Esq. (raparisi@pbnlaw.com)
*Proposed Counsel to Debtors*

In Re:

American Gaming & Electronics, Inc., *et al.*,[1]

Debtors.

Case No.: 18-30507 (ABA)

(Joint Administration Pending)

Chapter: 11

**AFFIDAVIT OF ANTHONY TOMASELLO IN SUPPORT OF DEBTORS' CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

ANTHONY TOMASELLO, of full age, pursuant to 28 U.S.C. § 1746, hereby certifies as follows:

1. I am the President and Chief Executive Officer of AG&E Holdings Inc. ("AG&E") and American Gaming & Electronics, Inc. ("American Gaming", and together with AG&E, the "Debtors"). I am generally familiar with the Debtors' day-to-day operations, business, financial affairs, and books and records.

2. On the date hereof (the "Petition Date"), the Debtors each commenced a case by filing a petition for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of New

---

[1] The Debtors in these Chapter 11 Cases (joint administration pending) and the last four digits of their employee identification numbers are: American Gaming & Electronics, Inc. (4630) and AG&E Holdings Inc. (4630).

1

4050312

Jersey. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108.

3.  I submit this Affidavit to provide an overview of the Debtors, their businesses, and the chapter 11 cases, as well as to support the Debtors' chapter 11 petitions and First Day Pleadings. I have been with AG&E Holdings Inc., a public company, since late 2016, when my company, Advanced Gaming Associates, Inc., a private company, merged into AG&E. As a result of my time with the Debtors, my review of relevant documents, and my discussions with other members of the Debtors' senior management team, I am familiar with the Debtors' day-to-day operations, business affairs, and books and records. Except as otherwise noted, I have personal knowledge of the matters set forth herein and all facts set forth in the Affidavit are based on my personal knowledge, my discussions with other members of the Debtors' senior management, my review of relevant documents, or my opinion based on my experience and knowledge of the Debtors' operations and financial conditions. In making this Affidavit, I have relied in part on information and materials that the Debtors' personnel and advisors have gathered, prepared, verified, and provided to me, in each case under my ultimate supervision, at my direction, and/or for my benefit in preparing the Affidavit. I am authorized to submit the Affidavit on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

4.  To minimize the adverse effects of filing for chapter 11 on their businesses, the Debtors have filed motions and pleadings seeking various types of "first day" relief (collectively, the "First Day Pleadings"). The First Day Pleadings seek relief intended to allow the Debtors to perform and meet those obligations necessary to fulfill their duties as debtors in possession. I am familiar with the contents of each First Day Pleading and believe that the relief sought in each

First Day Pleading (a) is necessary to enable the Debtors to operate in chapter 11 with minimum disruption or loss of productivity or value, (b) constitutes a critical element in achieving a successful reorganization of the Debtors, and (c) best serves the Debtors' estate and their creditors' interests. The facts set forth in each First Day Pleading are incorporated herein by reference.

5. The Affidavit is divided into two parts. Part I provides background information about the Debtors, their business operations, their corporate and capital structures, their restructuring efforts, and the events leading up to the filing of the Chapter 11 Cases. Part II sets forth the relevant facts in support of each of the First Day Pleadings.

## PART I

### I. BACKGROUND

#### a. Company History and Debtors' Businesses

6. Wells-Gardner Electronics Corporation ("Wells"), the original name of AG&E, was formed in Illinois in 1925. Wells was a global distributor and manufacturer of liquid crystal display (LCD) video monitors and other related parts for a variety of markets including, but not limited to, gaming machine manufacturers, coin-operated video game manufacturers and other display integrators.

7. Wells soon became the largest independent distributor of gaming parts in North America, serving more than 700 casinos throughout the United States. Wells also remanufactured used gaming equipment and sold new gaming machines in New Jersey and Connecticut, and had an international distribution channel that reached the Caribbean and Puerto Rico, Canada and Asia.

8. During its early days, Wells had offices in Las Vegas, New Jersey, Florida and Illinois.

4050312

9. On September 12, 2014, Wells-Gardner sold its LCD monitor business operations, and on October 30, 2014, changed its name to AG&E Holdings Inc.

10. In 2006, I founded Advanced Gaming Associates, LLC ("AGA") based out of Hammonton, NJ. I was the President, CEO and sole owner of AGA from 2006 through 2016. AGA was in the business of providing support for all things "gaming," including gaming machine repairs, and ran a successful operation for some 10 years, prior to merging into AG&E.

11. In 2016, I was approached by AG&E Holdings (the former Wells-Gardner) and asked if I would consider merging my gaming machine repair business into AG&E's gaming machine parts business. AG&E, despite its storied past, had been losing money for many, many years and its Board had hoped that a merger of my repair business into the AG&E parts business would help to stem those losses. AGA had been, prior to the merger, a privately held company, which generated, in the year ending prior to the merger, approximately $6.7 million in revenue, primarily attributable to its technical service contract supporting slot machine gaming operations throughout North American and internationally.

12. The merger was completed late in 2016, and on the closing date of the merger, the separate legal existence of AGA ceased with American Gaming continuing as the surviving entity and remaining a wholly-owned subsidiary of AG&E.

13. The Debtors believed that the merger of the companies would form the foundation of the leading parts and services provider for the casino and gaming market in the United States, and beyond. Specifically, the merged companies under the American Gaming umbrella intended to operate in three lines of business: Parts Distribution, Services (including technical, maintenance, installation, and professional services), and Products.

4050312

14. The consideration to be paid to me for the transaction between the Debtors and AGA was a mix of stock of AG&E and a five-year note. At closing, I received new shares in AG&E equal to approximately 31% of the outstanding shares of AG&E's common stock, and I became the Chief Executive Officer of AG&E. I also received two promissory notes from AG&E in the combined amount of $2,000,000.[2]

### b. Events Leading to Debtors' Chapter 11 Filings

15. The merger of the two companies did not deliver as billed. While the services side of the business (my former AGA business) continued to achieve positive EBITDA, the parts side of the business from the old AG&E continued to lose money.

16. Importantly, with respect to the parts side of the business, the Debtors relied heavily on one customer for revenue generation (accounting for 20.3% of total revenues in 2017 and 32% of total accounts receivable as of December 31, 2017) and on one vendor that supplied a critical component for certain of its products. In the first quarter of 2018, total cost of goods sold for parts sales were concentrated 52% with that one vendor. Because of continuing losses, the payables balance to that vendor climbed inexorably, and in April 2018, the Debtors were placed on credit hold by the vendor. Subsequent to the end of the second quarter, 2018, the vendor terminated its relationship with the Debtors in its entirety, rendering the Debtors unable to service its parts customers. As of the Petition Date, the parts side of the business has for all intents and purposes been shuttered.

17. On or about September 6, 2018, the Debtors received a letter (the "Default Letter") from its senior lender, North Mill Capital, asserting that an "Event of Default" had occurred under Section 8.4 of the North Mill Facility (defined below) due to a material adverse change in the Debtors' business and financial condition resulting from (i) the Debtors' net losses

---

[2] The Notes are in default with the combined amount of $1,791,000 due and owing as of the Petition Date.

in the six months ended June 30, 2018, and (ii) the termination of the Debtors' relationship with its significant vendor, as reported by the AG&E in its Quarterly Report on Form 10-Q for quarter ended June 30, 2018. North Mill further advised the Debtors in the Default Letter, that as a result of such Event of Default, North Mill has increased the interest rate under the NM Loan agreement by six percent over the current rate, and reserved all of its other rights under the NM Loan.

18. On September 13, 2018, AG&E filed a Form 8-K with the United States Securities and Exchange Commission, reporting the above "unscheduled material event[]".

19. In order to meet working capital needs, the Debtors sought additional funding for operations without success through a working capital loan and/or equity funding arrangements. Specifically, the Debtors reached out to the following prospective lenders, seeking financing, without success: PNC Bank, SSG Capital Advisors, Spectrum Capital, Innovation Capital, Tiger Group, White Winston and North Mill.

20. Presently, the Debtors do not have sufficient cash to cover operations. North Mill has agreed to fund the Debtors going forward to a transaction, but only under the protections of the Bankruptcy Code. I have also agreed to provide funding, as described herein and in the Cash Collateral and DIP Motion. The Debtors intend to restructure through these cases, go private to avoid the crippling and continuing administrative costs of being a public company, and shed the struggling parts and products business, and focus on the services business. Part of the restructuring will include a merger of AG&E (a holding company with no operations) and its subsidiary, American Gaming, to, *inter alia*, reduce post-petition, administrative costs of these estates without prejudicing any creditors. I believe this will position the Debtors for a successful restructuring through a new value plan wherein the company would be taken private, essentially

re-emerging as the old AGA, shedding the overhang of the public company, which is not sustainable for a business of this size, as well as shedding the money-losing parts business.

### c. The Debtors' Workforce

21. The Debtors currently employ approximately 60 employees in the United States. Virtually all of these employees work in the service division of the Debtors, or in the back office. Shortly before the Petition Date, the Debtors let go approximately 10 employees that worked in the struggling parts and products division of the business. The employees provide a variety of services to support the Debtors' operations, mainly in the services division of the company. Employee benefits include participation in a 401K plan and health insurance. As of the Petition Date, the Debtors owe their employees approximately $65,000 in Accrued Wage and Salary Claims (one-week's payroll – due to be paid on Friday, October 19, 2019.).

### d. The Debtors' Corporate and Capital Structure

22. AG&E is the 100% owner of its subsidiary, American Gaming.

23. As of the date hereof, the Debtors' principal funded debt obligation is as follows:

> i. <u>Prepetition Revolving Credit Facility</u>

24. American Gaming is party to a Loan and Security Agreement dated November 22, 2017 with North Mill, as may be amended, supplemented, amended and restated or otherwise modified from time to time, (the "<u>North Mill Facility</u>"). AG&E Holdings is a guarantor under the North Mill Facility.

25. Under the North Mill Facility, North Mill makes advances to Borrower under a revolving credit facility in an amount up to (a) eighty-five percent (85%) of the aggregate outstanding amount of eligible accounts under certain conditions and (b) one hundred percent (100%) of the outstanding amount of my junior participating interest (more on this below).

26. The North Mill Facility is secured by first priority liens on and security interests in substantially all of American Gaming's real and personal property (collectively, the "Collateral"), including, without limitation, cash and cash equivalents.

27. On September 19, 2018, I purchased from North Mill a junior participation in the North Mill Facility in the amount of One Hundred Thousand Dollars ($100,000). This was effectuated because the Debtors were in need of an over-advance from North Mill, in order to make payroll, and North Mill was unable to accommodate such an over-advance. As a result of my "purchase" of a $100,000 junior position in North Mill's lending facility, North Mill was able to re-loan those funds to the Debtors as an over-advance, which enabled the Debtor to make payroll.

28. As evidenced by the cash collateral Budget annexed as Exhibit B to the proposed Interim Order of the Cash Collateral and DIP Motion, American Gaming anticipates requiring another over-advance post-petition, which, subject to the Debtors' approval of the bankruptcy exit plan (pursuant to which I intend to take the Debtors private), I plan to finance in the same manner as the initial $100,000 over-advance, i.e., by purchasing further junior participation interests in North Mill's loan. The Debtors will be unable to meet their post-petition obligations in the ordinary course absent these post-petition loans from me.

29. As of October 15, 2018, the Debtors are obligated under the North Mill Facility in the approximate aggregate principal amount of $ $507,657.74, inclusive of my junior participation as described herein.

ii. Insider Debt

30. On November 30, 2016, in connection with its purchase of the private company AGA from me, AG&E issued a promissory note (the "Earn-Out Note") to me. The note had a

4050312

principal amount of $1.0 million and an interest rate of 5% per annum. The note matured on November 30, 2019 and was payable in thirty-six equal payments of $29,971 on the first of each month. Pursuant to the terms of the Earn-Out Note, an additional Earn-Out Note in the amount of $1.0 million was issued to me as of November 30, 2017 because the Debtors achieved in excess of $5 million in service revenue in the first earn-out period of December 1, 2016 through November 30, 2017. This additional Earn-Out Note has similar terms to the original note with the exception of a maturity date of November 30, 2020.

31. The Earn Out Notes are both currently in default with the amount of $1,791,000 due and owing in the aggregate as of the Petition date.

### iii. Equity Interests

32. The Debtors' common stock is traded on the OTCQB Marketplace under the symbol "AGNU". On December 31, 2017, there were approximately 429 holders of record of the common shares of the Debtors. The Debtors did not pay any dividends in 2016, 2017, or 2018. The trading price of the stock today is approximately $0.017/share. The Debtors have Net Operating Loss carryforwards of some $12 million (federal) and $15 million (Illinois) dating all the way back, in some cases, to 2001.

### iv. Exit Plan

33. The Debtors intend to restructure by: (i) merging the subsidiary into the holding company to save administrative costs, and (ii) confirming a plan pursuant to which I would take the company private, essentially shedding the historical problems of the public company and the parts side of the business. The reorganized company would be engaged only in the service business. Our intention is to file a plan and disclosure statement within 10 days of the filing date and obtain confirmation by year end. My personal resources, which I am using and will use to

fund this plan are extremely limited, and absent a quick exit, there will be insufficient funds available for the plan to succeed.

## PART II

I.  **FIRST DAY PLEADINGS**[3]

34.     In furtherance of these objectives, the Debtors expect to file, and respectfully request that this Court approve, the First Day Pleadings. I have reviewed each of the First Day Pleadings and proposed orders (including the exhibits thereto) and the facts set forth therein are true and correct to the best of my knowledge, information, and belief. Moreover, I believe that the relief sought in each of the First Day Pleadings (a) is vital to enable the Debtors to make the transition to, and operate in, chapter 11 with minimum interruption or disruption to their businesses or loss of productivity or value, and (b) constitutes a critical element in maximizing value during these chapter 11 cases. The Debtors' attorneys have explained to me the customary practices with regard to the requested relief in chapter 11 business reorganization cases and the rationale for these pleadings.

   a.  **Administrative and Procedural First Day Pleadings**

35.     <u>Joint Administration Motion</u>. The Debtors request entry of an order consolidating the Debtors' chapter 11 for procedural purposes only. Many, if not most, of the motions, applications, and other pleadings filed in these chapter 11 cases will relate to relief sought jointly by the Debtors. Joint administration of the chapter 11 cases, for procedural purposes only, under a single docket entry, will also ease the administrative burdens on the Court by allowing the Debtors' cases to be administered as a single joint proceeding instead of independent chapter 11 cases.

---

[3] Capitalized terms used in Part II but not otherwise defined shall have the meanings ascribed to them in the applicable First Day Motion.

36.     <u>Interim Compensation Motion</u>. The Debtors seek entry of an order establishing procedures for interim compensation and reimbursement of professional expenses during these chapter 11 cases. I believe that establishing orderly procedures for addressing issues related to the payment of professionals in these chapter 11 cases will enable efficient payment of professional fees and expenses, while ensuring all interested parties can monitor such costs. I also believe that these procedures will allow the Debtors to more accurately forecast cash flows and better administer their cash position. Additionally, these procedures will permit the Court and key parties in interest, including the United States Trustee, to more easily assess the reasonableness of the requested compensation and reimbursements.

37.     <u>Case Management and Administrative Procedures Motion</u>.  Approval of the Case Management Procedures will promote the efficient and orderly administration of these chapter 11 cases by, among other things, (a) limiting service of Court filings to those parties that have an interest in the subject matter thereof, (b) authorizing electronic service, and (c) fixing monthly omnibus hearings.  As in many chapter 11 cases that are jointly administered,[4] requiring the Debtors to provide multiple Debtor-specific creditor mailing lists would be would be burdensome to the Debtors, costly to the estates, and in many instances unnecessary, as certain motions would have no bearing on certain parties. Accordingly, the Debtors proposes to reduce the administrative burden and expense by limiting notice and service requirements pursuant to Bankruptcy Code §§ 102(1)(A) and 105(a) and Bankruptcy Rule 2002.

38.     <u>Bar Date Motion</u>. The Debtors request that the Court establish the General Bar Date and Governmental Bar Date. The Governmental Bar Date is at least 180 days after the Petition Date as required by section 502(b)(9) of the Bankruptcy Code. Establishing the Bar Dates will enable the Debtors to administer these chapter 11 cases as efficiently and

---

[4] The Debtors have filed a motion for joint administration concurrently with the Motion.

4050312

expeditiously as possible. The Debtors submit that the proposed notice procedures set forth in the Bar Date Motion will provide creditors with sufficient time to prepare and timely file proofs of claim.

### b. Operational First Day Pleadings

39. <u>Cash Collateral and DIP Motion</u>. Pursuant to the Cash Collateral and DIP Motion, the Debtors request that the Court grant the following relief:

   a. authorizing the Debtors to obtain up to $1,500,000 in post-petition financing from North Mill, including my contributions as a junior participant; and

   b. authorizing the Debtors' use of cash collateral of North Mill, and approving adequate protection for North Mill in the form of (a) automatically perfected replacement liens pursuant to sections 361 and 363 of the Bankruptcy Code, to the extent North Mill's cash collateral is used and to the extent of any diminution in the value of North Mill's collateral, with the same priority in the Debtors' post-petition collateral, and proceeds thereof, that North Mill's held in the Debtors' prepetition collateral, (b) the continued operation of the Debtors' businesses and (c) North Mill's continued ability to collect on the Debtors' accounts and apply same to Borrowers' pre-petition or post-petition obligations under the North Mill Loan.

40. This financing proposed by the DIP Motion is necessary for the Debtors to continue operations until they can seek final Court approval. The DIP facility should be approved because: (1) the Debtors are unable to obtain unsecured, administrative priority or junior secured creditor; (2) the DIP facility is necessary to preserve assets of the Debtors' estates; and (3) the DIP facility is fair, reasonable, and appropriate given the circumstances. North Mill

is the only party that offered and is willing to provide the Debtors with post-petition financing on the terms and conditions set forth in the DIP Agreement. Additionally, the Debtors' request to use cash collateral and provide adequate protection should be approved because the Debtors do not have sufficient unencumbered cash to fund their business operations and the Debtors will not be able to pay wages, rent, utility charges, and other critical operating expenses.

41. <u>Wages and Benefits Motion</u>. As set forth above, the Debtors employ approximately 60 employees. Substantially all of the Debtors' employees are full-time employees. In the ordinary course of business, the Debtors' employees' payroll cycle runs weekly; *i.e.*, on every Friday for the prior week; the next payroll period (which covers Monday, October 1, 2018 through Sunday, October 7, 2018, all of which is pre-petition) is scheduled to be disbursed on Friday, October 12, 2018.

42. By the Wage and Benefits Motion, the Debtors seek authority to pay approximately $65,000 for payroll and related costs, such as withholdings, deductions, and payroll-related taxes (the "<u>Accrued Wage and Salary Claims</u>"), which estimated amounts represent prepetition wages owed to employees. Importantly, no employee will be paid more than the $12,850 priority cap imposed by Bankruptcy Code section 507(a)(4).

43. In addition to paying the Accrued Wage and Salary Claims, the Debtors seek authority to pay benefits, reimbursable business expenses and other employee-related costs, and to continue employee programs with respect to vacation, sick, personal and holiday leave and similar benefit programs as further set forth herein.

44. I believe that to ensure that the Debtors can continue to operate their businesses without interruption, to preserve value for the estates, and to maximize the value of the businesses, it is important to continue to pay their employees certain prepetition wages, salaries,

4050312

other cash and non-cash compensation, employee benefits, and reimbursable expenses. I further believe that the majority of the Debtors' employees rely on their compensation, benefits, and reimbursement of expenses to satisfy their daily living expenses. Consequently, they will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid compensation, benefits, and reimbursable expenses. Moreover, if the Debtors are unable to satisfy such obligations, employee morale and loyalty will be jeopardized at a time when employee support is critical.

45.    <u>Equity Trading Procedures Motion</u>. The Debtors have generated, and are currently generating, a significant amount of net operating loss carryforwards ("<u>NOLs</u>") for U.S. federal income tax purposes. The Debtors estimate that, as of the date hereof, the Debtors have incurred, for U.S. federal income tax purposes, consolidated NOLs in excess of $12 million (federal) and $15 million (Illinois). The NOLs could be a valuable asset because under the Internal Revenue Code (the "<u>IRC</u>"), the Debtors can carry forward their NOLs up to twenty (20) taxable years and reduce their aggregate tax obligations. *See* 26 U.S.C. § 172. NOLs may also be utilized to offset taxable income generated by transactions completed during these chapter 11 cases.

46.    The Debtors could lose the ability to use their NOLs if they experience an "ownership change" for federal income tax purposes. To prevent this potential loss of property of the Debtors' estates, the Debtors request Court approval of the procedures detailed in the Equity Trading Procedures Motion to monitor and govern the transfers of AG&E Holdings, Inc.'s "Equity Securities" during the pendency of these chapter 11 cases, or until further order of the Court. Therefore, I submit that the relief requested in the Equity Trading Procedures Motion is necessary and in the best interests of the Debtors' estates, their creditors and other parties in interest.

47. <u>Utilities Motion</u>.  The Debtors incur expenses for water, sewer, electricity, gas, telephone, waste disposal, and similar utility products and services provided by various utility providers (the "<u>Utility Providers</u>").  The Debtors operate facilities at a number of locations, including in Hammonton, New Jersey and Las Vegas, Nevada.  On average, the Debtors spend approximately $4,650.26 each month, or approximately $2,325.13 every two weeks, on utility costs.

48. I believe that uninterrupted utility services are essential to the Debtors' ongoing operations.  Additionally, any interruption of utility services, even for a brief period of time, likely would negatively affect the Debtors' reorganization efforts.  Therefore, it is critical that utility services continue uninterrupted during these chapter 11 cases.

49. <u>Bank Account Motion</u>.  The Debtors maintain multiple bank accounts at Wells Fargo for different purposes, including for payroll, operations, and controlled disbursements.  The Debtors' Cash Management System and Bank Accounts enable the Debtors to control and monitor their funds, reduce administrative expense and monitor performance.  The Debtors seek, through the Bank Account Motion, authority to maintain their current Bank Accounts and prepetition Cash Management System so as not to disrupt the Debtors business or their relationships with customers and vendors.  Additionally, in order to avoid unnecessary costs, delays, and other inefficiencies, the Debtors seek to use existing business forms.  Finally, the Bank Account Motion seeks a waiver of the deposit guidelines set forth in section 345 insofar as the Debtors funds are held by a strong banking institution.  Such waiver will be subject to the rights of the US Trustee to object to same.

4050312

I certify under penalty of perjury that the foregoing is true and correct.

/s/ Anthony Tomasello

4050312